UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AYNALEM MOBA, et al.,<br><br>                     Plaintiff,<br><br>         v.<br><br>TOTAL TRANSPORTATION<br>SERVICES INC, et al.,<br><br>                     Defendant. | CASE NO. C13-138 MJP<br><br>ORDER DENYING PLAINTIFFS'<br>MOTION FOR A CONTINUANCE<br>AND GRANTING IN PART<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT |

THIS MATTER comes before the Court on Defendants Seattle Freight Services, Inc.

("Seattle Freight"), Rick Livingston ("Livingston"), and Vance Rogers' ("Rogers") Motion for

Summary Judgment.  Plaintiffs filed an opposition brief, in which they request a continuance

pursuant to Fed. R. Civ. P. 56(d).  The Court considered the Motion for Summary Judgment

(Dkt. No. 30), Plaintiffs' Motion to Continue Defendants' Motion for Summary Judgment (Dkt.

No. 42), the Reply (Dkt. No. 45), and all related documents.  The Court DENIES Plaintiffs'

Motion to Continue.  The Court GRANTS in part and DENIES in part Defendants' Motion for

Summary Judgment.

1

**Background**

2

**A.  Seattle Freight**

3

4

Seattle Freight provides freight transportation to national and international carriers.  (Dkt. No. 32 at 1.)  About half its business is transporting freight arriving at the Port of Seattle or the Port of Tacoma.  (Id.)  The remainder of the business is delivering and picking up freight throughout the Pacific Northwest.  (Id.)  Rick Livingston ("Livingston") is the Operations Manager (Id.), and Vance Rogers ("Rogers") was Vice President from 2008 to 2013.  (Dkt. No. 31 at 1.)

5

6

7

8

9

Independently owned operators ("IOOs") lease their trucks through a Transportation and Lease Agreement ("TLA") and operate under Seattle Freight's authority for the term of the lease.  (Dkt. No. 32 at 2.)  In 2010, at the "height" of Seattle Freight, 120 to 125 IOOs had lease agreements with Seattle Freight.  (Dkt. No. 31 at 2.)

10

11

12

13

**B.  Terms and Conditions of Agreement Between IOOs and Seattle Freight**

14

15

Seattle Freight dispatchers offer jobs to IOOs who have a current TLA after a customer contacts Seattle Freight with a job.  (Dkt. No. 32 at 2.)  IOOs are free to accept or reject the offers.  (Id.)  If an IOO accepts a job, the IOO may perform the job or delegate it to one of the IOO's employees.  (Id.)  Many of the assignments for the next day are posted the day before.  (Id.)  If an IOO does not have an assignment, he or she has the option to wait at Seattle Freight for last minute jobs and typically leaves by noon if no job has become available.  (Id.)  Assignments are first offered to "senior drivers" (Dkt. No. 34 at 14), and the remaining jobs "[are] offered in rotation" to the rest of the IOOs.  (Dkt. No. 31 at 2.)

16

17

18

19

20

21

22

23

Plaintiffs are IOOs of East African ethnicity who leased their trucks to Seattle Freight for short-distance freight hauling between the Burlington Northern Santa Fe Corporation ("BNSF")

24

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 2

rail terminals and the Port of Seattle.  (Dkt. No. 32 at 2.)  Nine companies, including Seattle

Freight, provide these services to BNSF.  (<u>Id.</u>)

IOOs are paid "per job" – they do not have a salary or a fixed commission.  (Dkt. No. 32

at 3.)  IOOs can buy several trucks and hire drivers in order to increase their profit, or they can

accept longer-haul jobs.  (<u>Id.</u>)  IOOs receive checks on a bi-monthly basis after Seattle Freight

calculates the jobs performed and deducts charges for leasing a company radio or purchasing

insurance through Seattle Freight, if applicable.  (<u>Id.</u>)

**C.  2012 Work Stoppage**

In February 2012, about 80 IOOs, including Plaintiffs, "engaged in a coordinated work

refusal" for two weeks.  (Dkt. No. 31 at 3.)  Plaintiff Aynalem Moba ("Moba") and six other

people gave requests to Seattle Freight, and Moba maintains their requests involved payment

structures, as well as alleged discriminatory conduct they were subject to.  (Dkt. No. 34 at 16-

17.)  Moba contends after he returned to work, Livingston was telling the other drivers Moba

was a liar and was brainwashing them.  (<u>Id.</u> at 20.)  Moba also alleges Livingston reduced

Moba's amount of work.  (<u>Id.</u>)  Records indicate and Moba agrees he made more money in 2012

than he did in 2011.  (<u>Id.</u> at 21, 27)  He also retained his senior driving status for a few months

after the work stoppage.  (<u>Id.</u> at 27.)

Defendants contend Plaintiffs did not stop working because of discriminatory conduct

and any adverse treatment that may have occurred after the stoppage was not a result of

discriminatory treatment or retaliation.  (Dkt. No. 30 at 17; Dkt. No. 32 at 4.)  Livingston said the

"only issues the IOOs raised with Seattle Freight in early 2012 were about payment structure."

(Dkt. No. 32 at 5.)  Rogers agrees, stating he was present at a meeting where Moba presented

requests involving the payment structure and "nothing was said about any allegedly

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 3

discriminatory treatment." (Dkt. No. 31 at 4.) Rogers alleges the work stoppage "had a serious impact on BNSF[,]" and, as a result, "BNSF responded to the incident by giving more of its work to other trucking companies, resulting in a significant reduction in the local work available to Seattle Freight IOOs." (Id. at 3.) Further, the "Grand Alliance," which brought four steamship lines into the Port of Seattle, moved to the Port of Tacoma, causing reduced short-haul work for Seattle Freight. (Dkt. No. 32 at 4.) Despite reduced short-haul work, Seattle Freight did not terminate any TLAs. (Id.) When TLAs were up for renewal, Plaintiffs who wanted their TLAs renewed did have them renewed. (Id.) Seattle Freight also offered non-short-haul jobs to Plaintiffs. (Id. at 4-5.)

### D. Alleged Discriminatory Conduct

Moba alleges Defendants acted in a discriminatory manner towards Plaintiffs. (Dkt. No. 34 at 11.) Moba alleges Defendants said they were inferior, should go back to school, and should take an English language class. (Id.) Moba also alleges Plaintiffs were referred to as scavengers, animals, and the "N" word. (Id. at 11, 16.) Rogers says Seattle Freight did not have a culture of bias, bigotry, or racial animus: "I never heard a single racial epithet used by any one at Seattle Freight." (Dkt. No. 31 at 2.)

### E. Procedural History

Plaintiffs brought suit against Defendants, alleging violations of the Fair Labor Standards Act ("FLSA"), violations of the Washington Law Against Discrimination Act ("WLAD"), violations of Washington wage laws, intentional infliction of emotional distress, and negligence. (Dkt. No. 1.) Defendants move for summary judgment. (Dkt. No. 30.) Plaintiffs filed opposition to the summary judgment motion and moved for a continuance pursuant to Fed. R. Civ. P. 56(d). (Dkt. No. 42.)

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 4

**Discussion/Analysis**

**A.  Motion for Fed. R. Civ. P. 56(d) Continuance**

Under Fed. R. Civ. P. 56(d), "the district court may refuse to grant the party's application for summary judgment if the opposing party needs time to discover central facts."  Mackey v. Pioneer Nat'l Bank, 867 F.2d 520, 523 (9th Cir. 1989).  Although a motion for continuance is made pursuant to Fed. R. Civ. P. 56(d), prior to 2010 the motion was made pursuant to Fed. R. Civ. P. 56(f).  Fed. R. Civ. P. 56(d) (amended 2010).  Plaintiffs move to continue Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(d) in their opposition brief.  (Dkt. No. 42.)  In this brief, Plaintiffs only provide support for their Fed. R. Civ. P. 56(d) motion and do not make substantive arguments opposing summary judgment.  (Id.)

**a.  Legal Standard**

Under Fed. R. Civ. P. 56(d), if a nonmovant shows by declaration or affidavit it cannot present facts essential to justify its opposition for specific reasons, the court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Id.  The court may order a continuance for a summary judgment motion if the requesting party "submits affidavits showing that, without Rule 56 assistance, it cannot present facts necessary to justify its claims."  Family Home and Fin. Center, Inc. v. Fed. Home Loan Mortg. Corp., 525 F.3d 822, 827 (9th Cir. 2008).  The party making the request must show:

> (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.

Id.  The party must also show it has diligently pursued discovery.  Qualls By and Through Qualls v. Blue Cross of Cal., Inc., 22 F.3d 839, 844 (9th Cir. 1994).  If the requesting party does not comply with these requirements, the court may proceed to summary judgment.  Id.  The burden

1   lies with "the party seeking additional discovery to proffer sufficient facts to show that the

2   evidence sought exists" and that it would prevent summary judgment.  Nidds v. Schindler

3   Elevator Corp., 113 F.3d 912, 921 (9th Cir. 1996).

4          Plaintiffs' counsel, Mr. Hildes, requests a continuance asserting he needs to take specific

5   depositions, those of Livingston, Rogers, Gary Roddia, and Kevin Coon, but the discovery

6   deadline has passed and he has not shown he has diligently pursued discovery.  This action was

7   filed on January 24, 2013.  (Dkt. No. 1.)  The discovery deadline was initially November 15,

8   2013.  (Dkt. No. 13).  The Court granted Plaintiffs' motion to extend the deadline to February 7,

9   2014, to accommodate Mr. Hildes' travel and trial schedule.  (Dkt. No. 19.)  Mr. Hildes did not

10  request to depose Livingston, Rogers, Roddia, or Coon until February 13, 2014.  (Dkt. No. 44 at

11  1.)  Counsel scheduled Livingston and Rogers' depositions for February 24, 2014.  (Id.)  Due to

12  snow conditions, Mr. Hildes requested the February 24th depositions be rescheduled for the

13  following day.  (Id.)  Mr. Hildes completed Livingston's deposition, but not Rogers'.  (Id. at 2.)

14  The Court already extended the discovery deadline to accommodate Mr. Hildes, yet he still failed

15  to take the depositions of those Defendants or witnesses he believes necessary to support his

16  case.  Further, Mr. Hildes fails to set forth the specific facts he hopes to elicit from further

17  discovery.  See Family Home and Fin. Center, Inc., 525 F.3d at 827.

18          Mr. Hildes routinely requests extensions, suggesting he cannot adequately manage his

19  case load.  (Acorn et al. v. City of Seattle et al., Case No. 05-00460, Dkt. No. 39 (W.D. Wash.

20  2005); White v. Witt, Case No. 05-00695, Dkt. No. 75 (W.D. Wash. 2005); Skvorak et al. v.

21  Thurston County et al., Case No. 05-05100, Dkt. No. 42 (W.D. Wash. 2005); Dunn et al. v. Hyra

22  et al., Case No. 08-00978, Dkt. No. 34 (W.D. Wash. 2008); Hall et al. v. County of Whatcom

23  (WCSO) et al., Case No. 09-01545, Dkt. No. 151 (W.D. Wash. 2009); Love et al. v. City of

24

1  Olympia et al., Case No. 09-05531, Dkt. No. 35 (W.D. Wash. 2009); Klyne v. Lindros et al.,

2  Case No. 12-05105, Dkt. No. 19 (W.D. Wash. 2012); Rojsza v. Ferndale et al., Case No. 12-

3  01149, Dkt. Nos. 10, 15 (W.D. Wash. 2012); Elmi et al. v. SSA Marine, Inc. et al., Case No. 13-

4  01703, Dkt. No. 14 (W.D. Wash. 2013); Hendricks et al. v. Pierce County et al., Case No. 13-

5  05690, Dkt. Nos. 20, 25 (W.D. Wash. 2013)).  Granting Plaintiffs' motion for a continuance

6  would only perpetuate Mr. Hildes' behavior of excessively filing for extensions.  The Court

7  DENIES Mr. Hildes' motion because he failed to diligently pursue discovery and does not set

8  forth specific facts he hopes to elicit from further discovery.

9  **B.  Motion for Summary Judgment**

10  **a.  Legal Standard**

11

12  Summary judgment is appropriate under Fed. R. Civ. P. 56(a) "if the movant shows that

13  there is no genuine dispute as to any material fact."  See Celotex Corp. v. Catrett, 477 U.S. 317,

14  327 (1986).  Inferences drawn from the underlying facts must be viewed in the light most

15  favorable to the non-moving party.  Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp.,

16  475 U.S. 574, 587 (1986).  When the moving party has met its burden of showing no genuine

17  issue of fact exists, "its opponent must do more than simply show that there is some

18  metaphysical doubt as to the material facts."  Id. at 586.  The non-moving party must come

19  forward with specific facts that show a genuine issue exists for trial.  Id. at 587.  No genuine

20  issue for trial exists if the "record taken as a whole could not lead a rational trier of fact to find

21  for the non-moving party."  Id.  When an opposing party fails to respond to the motion for

22  summary judgment, the court does not consider such failure to be an admission the motion has

23  merit.  LCR 7(b)(2).

24

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 7

**b.  The FLSA and Washington Wage Law Claims**

The FLSA and Washington Wage Laws do not apply to independent contractors.  Under the FLSA, "employee" means "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  The Ninth Circuit has identified several factors courts should consider when determining whether one is an "employee" for purposes of the FLSA:

> 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981).  "Neither the presence nor the absence of any individual factor is determinative."  Id.  Whether one is an employee for purposes of the FLSA depends on the totality of the circumstances and whether, "as a matter of economic reality," the individual is dependent on the business he or she is serving.  Id.

The Washington Minimum Wage Act is based on the FLSA, and the definitions of "employee" are "functionally identical under the two acts."  Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 868 (2012).  When a state statute is taken essentially verbatim from a federal statute and no contrary legislative intent exists, "it carries the same construction as the federal law and the same interpretation as federal case law."  Id. (internal citations omitted).  In determining a worker's classification for purposes of the Minimum Wage Act, the court must ask "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."  Id. at 871.  Based on the Donovan factors and whether Plaintiffs were economically dependent on Defendants, the Court concludes

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 8

Plaintiffs were independent contractors and, as a result, not subject to the FLSA or Washington wage laws.

### 1)   Degree of the Alleged Employer's Right to Control Manner in Which Work is to be Performed

The agreement between Plaintiffs and Defendants not only explicitly states Plaintiffs are independent contractors, but its terms and conditions reflect the independent contractor status: "Lessor is not obligated to accept shipments offered by Lessee, or be available every business day[,]" "Lessor has complete control over Lessor's working conditions and the manner in which the load is transported[,]" and "Lessor may voluntarily accept or reject each shipment offered by Lessee without reprisal." (Id. at 8.) Defendants "shall have no right to, and shall not control the manner, or determine the method, of accomplishing Lessor's services." (Id.) They are also free to work for other carriers. (Id.) Plaintiffs are not required to be on-call, and the record does not suggest Plaintiffs are required to attend an orientation session or wear a uniform. (Id.) Other circuits have found plaintiffs in similar circumstances to be independent contractors. See, e.g., Herman v. Express Sixty-Minutes Delivery Serv. Inc., 161 F.3d 299 (5th Cir. 1998).

### 2)   Alleged Employee's Opportunity for Profit or Loss

IOOs are paid for each individual delivery, and because they do not have a salary or fixed commission, compensation varies according to which jobs they accept. (Dkt. No. 32 at 3.) Livingston says IOOs can increase their profits several ways: "some IOOs buy more than one truck and hire drivers in order to accept and complete more jobs[,]" and some "also increase their profit by accepting longer-haul jobs." (Id.) The drivers' opportunity for profit and loss is determined "largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business[,]" suggesting independent contractor status. Herman, 161 F.3d at 305.

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 9

### 3) Alleged Employee's Investment in Equipment or Materials Required for His Task or Investment in Employment of Helpers

The agreement between Plaintiffs and Defendants establishes Plaintiffs invest in the majority of their own equipment and have the ability to hire employees.  Plaintiffs drive their own vehicles and assume "full and sole responsibility for the payment of all compensation and expenses to such additional drivers, employees or sub-contractors." (Dkt. No. 32 at 8.)  Plaintiffs also "supply all tools and instrumentalities required to perform the services under" the agreement.  (Id. at 9.)  Although Moba alleges he could only buy insurance from Seattle Freight, his agreement indicates otherwise.  (Dkt. No. 34 at 24; Dkt. No. 32 at 9.)   Seattle Freight has "various categories of commercial insurance that it maintains" available to Plaintiffs, but Plaintiffs "are free to accept or reject such available coverage." (Dkt. No. 32 at 15.)  Plaintiffs may also "elect to obtain communications equipment through the Lessee, but [are] not required to do so." (Id. at 17.)  Other courts have determined independent contractor status is supported where the plaintiff drivers substantially invested in their businesses by "utiliz[ing] their own vehicles and all of their own tools and supplies" and were responsible for associated costs.  See, e.g., Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590, 608 (E.D. N.Y. 2012).

### 4) Whether the Service Rendered Requires a Special Skill

In order to become a truck driver and contract with Seattle Freight, Moba said he went to the Western Truck School "for truck driving and took a course for one month, and then took a license and then started the job." (Dkt. No. 34 at 4.)  Courts analyzing jobs similar to Plaintiffs' determined the tasks drivers completed required a significant degree of skill, including "professional driving skills, business management skills, knowledge of Department of Transportation regulations, and freight-handling skills[,]" suggesting independent contractor status.  Browning, 885 F. Supp. 2d at 608-609.

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 10

**5)  Degree of Permanence of Working Relationship**

Plaintiffs and Defendants enter into a one year agreement unless it is "mutually renewed in writing by both parties." (Dkt. No. 32 at 12.)  Either party also has the power to terminate the agreement "upon one day written notice." (Id.)  Nothing in the agreement "either obligates Lessee to offer any minimum number of shipments, or obligates Lessor to accept any minimum number of shipments." (Id.)  Nothing in the agreement suggests Plaintiffs must work for Defendants exclusively; Plaintiffs are free to contract with others.  (Id.)  This factor weighs in favor of independent contractor status.

**6)  Whether the Service Rendered is an Integral Part of the Alleged Employer's Business**

The court in Velu v. Velocity Exp., Inc., 666 F. Supp. 2d 300, 307 (E.D. N.Y. 2009) said the ultimate question in deciding whether a driver is an independent contractor is whether the driver is in business for himself or dependent on someone else's business.  Id.  Independent contractor status is supported when a driver "is free to make his own schedule, and may work for other delivery companies[;]" "has the discretion to decline [jobs;]" and "owns, insures, maintains, and services his delivery van without [the defendant's] reimbursement or contribution." Id. at 303.

Plaintiffs are truck drivers who are free to make their own schedule and work for other companies.  (Dkt. No. 32 at 8.)  Plaintiffs have discretion to decline delivery requests and are free to decide how to make the delivery.  (Id.)  Plaintiffs own their own trucks, and if they do not provide proof of insurance, the defendants deduct the costs of that insurance from its payments to the drivers.  (Dkt. No. 33 at 2.)  Plaintiffs could terminate their agreements with Defendants and immediately use their trucks to start working for another company.  Plaintiffs are ultimately in business for themselves, suggesting independent contractor status.  The Court concludes

1  Plaintiffs were independent contractors.  As a result, the Court GRANTS summary judgment on

2  the FLSA and Washington wage law claims.

3          **c.  Washington Law Against Discrimination Claims**

4        Under RCW 49.60.030, a person has the right to be free from discrimination based on

5  one's race or national origin, and this right includes the "right to obtain and hold employment

6  without discrimination." RCW 49.60.030(1)(a). RCW 49.60.030(1) has been interpreted "to

7  include the civil right of independent contractors to be free of unlawful discrimination in the

8  making and performance of contracts for personal services."  Marquis v. City of Spokane, 130

9  Wn. 2d 97, 112 (1996); see also Jones v. Rabanco, LTD., No. C03-3195P, 2006 WL 2583432, at

10  *5 (W.D. Wash. Sept. 6, 2006) ("Under Washington law, independent contractors, as well as

11  employees are covered by the WLAD.").  RCW 49.60.030(1) does not limit actions to the ones

12  listed in the statute.  Id. at 110.  Although an independent contractor can bring a claim under

13  RCW 49.60.030(1), he or she cannot bring a claim under RCW 49.60.180, unfair practices of

14  employers.  Id.

15        Plaintiffs claim Defendants violated RCW 49.60.30. (Dkt. No. 1 at 27.)  Plaintiffs allege,

16  "After participating in a strike, because of the hostile and discriminatory work environment . . .

17  Seattle Freight Service . . . retaliated against" them.  (Id. at 3.)  Plaintiffs also allege, for "the

18  racial, ethnic, and national origin slurs inflicted on Plaintiffs and the other drivers, as well as the

19  discriminatory treatment, Defendants and their employees and agents have unlawfully

20  discriminated against Plaintiffs[.]"  (Id. at 27.)  Plaintiffs' Complaint is vague as to which

21  WLAD claims Plaintiffs are specifically alleging.  (Id.)  Based on the overall content of the

22  Complaint, the Court concludes Plaintiffs allege hostile work environment and retaliation claims.

23

24

**1) Hostile Work Environment**

Although case law discussing hostile work environment claims often refers to RCW 49.60.180, Defendants point to no case law, and the Court has not found case law stating independent contractors cannot bring hostile work environment claims.  (Dkt. No. 30 at 12.)  In order to establish a prima facie case for hostile work environment, the plaintiff must show he suffered harassment that (1) was unwelcome, (2) based on his race or national origin, (3) affected the terms and conditions of his employment, and (4) was imputable to defendants.  Davis v. West One Auto. Group, 140 Wn. App. 449, 457 (2007).  The harassment "must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment."  Glasgow v. Georgia-Pacific Corp., 103 Wn.2d 401, 406 (1985).  Usually whether offensive comments affect employment conditions is a factual question, unless they are isolated, casual, or trivial incidents.  Alonso v. Qwest Commc'n Co., LLC, 315 P.3d 610, 619 (2013).  Courts look to the totality of the circumstances in determining whether the harassment is sufficiently severe and persistent "to seriously affect the emotional or psychological well being" of the plaintiff.  Id. at 406-407.  Courts consider the frequency of the alleged discriminatory conduct; whether it was physically threatening or humiliating, or a mere offensive utterance; its severity; and whether it unreasonably interfered with the plaintiff's work performance.  Sangster v. Albertson's, Inc., 99 Wn. App. 156, 163 (2000).

Plaintiffs allege they suffered from a hostile work environment.  Moba said he was told he was inferior, to go back to school, and to take an English language class.  (Dkt. No. 34 at 11.)  He also said he overheard the "N" word and was told people could not understand his accent.  (Id.)  Moba said Livingston gave a picture of an ape to one of the drivers, suggesting the ape was his brother.  (Id. at 12.)  He also said he heard insults over the radio and Defendants referred to

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 13

1   them as scavengers and animals.  (Id. at 12-15.)  Moba spoke of one incident where Livingston

2   and Coon compared them to refugees waiting for a helicopter to drop food.  (Id. at 13.)  Moba

3   said Defendants referred to Plaintiffs "like a talking monkey," gave them excess work, and made

4   them sit in the office "just making us a laughing stock."  (Id. at 15.)  Moba asserted he and the

5   other Plaintiffs participated in the 2012 work stoppage in part because of the allegedly

6   discriminatory insults.  (Id. at 17.)

7          Rogers maintains, "there was absolutely no culture of bigotry, bias, or racial animus of

8   any kind at the company."  (Dkt. No. 31 at 2.)  He says he "never heard a single racial epithet

9   used" by anyone at Seattle Freight.  (Id.)  Rogers says he was present at the meeting when Moba,

10  who represented the IOOs refusing to work, made payment structure requests to Seattle Freight.

11  (Id. at 4.)  Rogers contends, "nothing was said about any alleged discriminatory treatment."  (Id.)

12  He was also present at another meeting where the IOOs "indicated they had no problem with

13  Seattle Freight, and were instead concerned about conditions at the Port of Seattle."  (Id.)

14  Livingston maintains, although it is "true that truckers don't always use polite language with

15  each other," he does "not personally have a swearing habit."  (Dkt. No. 32 at 5.)  He also says he

16  has never "seen or heard any Seattle Freight employee use a racial epithet" and an IOO has never

17  approached him to complain about any employee's racially discriminatory behavior.  (Id.)

18         The Parties dispute the existence and pervasiveness of harassing comments.  Viewing the

19  record in the light most favorable to Plaintiffs, multiple issues of material fact remain.  The Court

20  DENIES summary judgment on the hostile work environment claim.

21                        **2) Retaliation**

22         In order to establish a prima facie case for retaliation under WLAD, the plaintiff must

23  show (1) he or she engaged in a protected activity, (2) the employer took an adverse action, and

24

ORDER DENYING PLAINTIFFS' MOTION FOR
A CONTINUANCE AND GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 14

1  (3) a causal link exists between the protected activity and the adverse action.  <u>Hines v. Todd</u>

2  <u>Pacific Shipyards Corp.</u>, 127 Wn. App. 356, 374 (2005).  Once the plaintiff makes a prima facie

3  case, it establishes a rebuttable presumption of discrimination.  <u>Renz v. Spokane Eye Clinic,</u>

4  <u>P.S.</u>, 114 Wn. App. 611, 618 (2002).  The burden then shifts to the defendant "to produce

5  admissible evidence of a legitimate, nondiscriminatory, nonretaliatory reason" for the adverse

6  action.  <u>Id.</u>  "Significantly, this is merely a burden of <u>production</u>, not a burden of <u>persuasion</u>."

7  <u>Id.</u>  If the defendant produces some evidence showing a nondiscriminatory reason for the adverse

8  action, the plaintiff "must then create a genuine issue of material fact by showing" the

9  defendant's reason for the adverse action was merely pretext for a discriminatory or retaliatory

10  purpose.  <u>Id.</u> at 619.

11      Plaintiffs allege they stopped working for two weeks in 2012 in part because of the verbal

12  insults.  (Dkt. No. 34 at 17.)  However, Defendants rebutted any inference of discrimination by

13  presenting evidence showing a nondiscriminatory and nonretaliatory reason for why Plaintiffs

14  may have received less work after the work stoppage.  After the 2012 work stoppage, short-haul

15  work at Seattle Freight was reduced for two reasons: the "Grand Alliance" moved from the Port

16  of Seattle to the Port of Tacoma and BNSF spread its work more evenly among carriers, taking

17  work away from Seattle Freight.  (Dkt. No. 31 at 3; Dkt. No. 32 at 3.)  Plaintiffs failed to rebut

18  this evidence, so Defendants are entitled to dismissal of this claim as a matter of law.  <u>See Renz</u>,

19  114 Wn. App. at 619.  The Court GRANTS summary judgment on the retaliation claim.

20          **d.  Negligence and Emotional Distress Claims**

21      Plaintiffs fail to establish a prima facie case for negligence or IIED.  In order to survive

22  summary judgment on a negligence claim, Plaintiffs must establish "a duty, a breach, proximate

23  cause, and damage or injury."  <u>Haubry v. Snow</u>, 106 Wn. App. 666, 678 (2001).  Plaintiffs never

24

1   allege what duty Defendants had, how they breached it, or how it proximately caused injury to

2   Plaintiffs.  In order to survive summary judgment on an IIED claim, Plaintiffs must establish (1)

3   outrageous and extreme conduct, (2) intentional or reckless infliction of emotional distress, and

4   (3) an actual result of severe emotional distress to Plaintiffs.  <u>Kloepfel v. Bokor</u>, 149 Wn. 2d 192,

5   195 (2003).  Plaintiffs do not assert any emotional distress they suffered as a result of

6   Defendants' alleged conduct.  The Court GRANTS summary judgment on the negligence and

7   emotional distress claims.

8   <strong><u>Conclusion</u></strong>

9       The Court DENIES Plaintiffs' request for a continuance.  The Court GRANTS summary

10   judgment in favor of Defendants on Plaintiffs' claims except the hostile work environment claim.

11   The Court DENIES summary judgment on the hostile work environment because genuine issues

12   of material fact remain.

13       The clerk is ordered to provide copies of this order to all counsel.

14       Dated April 25, 2014.

15

16

17                         Marsha J. Pechman

18                         Chief United States District Judge

19

20

21

22

23

24